**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CAROLEE, LLC, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 2:12-cv-02630 (WHW) |
| | : | |
| EFASHION SOLUTIONS, LLC, | : | |
| | : | |
| Defendant. | : | |

**Walls, Senior District Judge**

Plaintiff Carolee, LLC ("Plaintiff") moves for default judgment against Defendant, eFashion Solutions, LLC ("Defendant") pursuant to Federal Rule of Civil Procedure 41. Plaintiff's motion is granted as modified below.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and Defendant had two relationships: a contract called the E-Commerce Operations Agreement ("E-Commerce Agreement") and an informal agreement for "direct sales."

On June 3, 2010, the parties entered the E-Commerce Agreement, according to which Defendant agreed to design, create and maintain a website (the "Client Site") to sell Plaintiff's products, as well as to maintain a warehouse to stock Plaintiff's inventory and fulfill orders. Compl. ¶¶ 14-15, 18, Docket Entry Number ("D.E. No.") 1; E-Commerce Agreement, D.E. No. 1-1. Under this agreement, Defendant maintained inventory, processed orders and payments and shipped products to customers. Compl. ¶ 15. It provided Plaintiff with monthly sales statements and payment of amounts equal to 70% of net retail sales, subject to certain adjustments. Compl.

1

**NOT FOR PUBLICATION**

¶ 17; E-Commerce Agreement Ex. A, Statement of Work ("Statement of Work"), § 3, D.E. No. 1-1 at 22.

In exchange for these services, Defendant was to be paid in two ways. First, the Statement of Work provides that Defendant's "Service Fee" is the right to 30% of net proceeds from internet sales. Statement of Work § 3. Second, "[i]n addition to the Service Fee," Defendant received a "Project Launch Fee" of $75,000 related to the "design, integration, programming and deployment" of the website. *Id.* § 3(c).

The E-Commerce Agreement provides that either party may terminate upon written notice; if the cause for termination is failure to pay, the breaching party has five days to cure the nonpayment. *Id.* § 11.2. Regardless of which party breaches, upon termination, the Defendant becomes obligated to transfer to Plaintiff any inventory in its possession and the non-breaching party becomes entitled to "all out-of-pocket costs which were or will be incurred due to such breach of this Agreement and which could not be avoided or otherwise mitigated by the non-breaching party." *Id.* § 11.3. But the Agreement limits damages:

> Except with respect to the indemnification obligations contained in this agreement, or to the extent arising out of negligence or an intentional breach of this agreement, neither party shall be liable (whether in contract, warranty, tort, product liability or other theory), to the other party for cost of cover or any indirect, incidental, special, consequential, punitive or exemplary damages (including damages for loss of profit, business or data) arising out of this agreement.

*Id.* § 10.2. Finally, if the termination leads to litigation, the non-breaching party is entitled to attorneys' fees: "The prevailing Party in any legal action or proceeding arising out of or relating to this Agreement shall be entitled to an award of its reasonable legal expenses in connection therewith." *Id.* § 12.8.

**NOT FOR PUBLICATION**

On May 2, 2012, Plaintiff filed a complaint alleging that Defendant breached the E-Commerce Agreement in at least two ways. First, Plaintiff argues that Defendant failed to make payments due for sales in June 2011, July 2011, August 2011, September 2011, October 2011, December 2011 and January 2012, amounting to a nonpayment of $130,980.72. Compl. ¶¶ 22, 44. After making assurances it would pay, Defendant returned to Plaintiff some of its outstanding inventory as required under the E-Commerce Agreement, but Plaintiff claims this inventory was incomplete and/or damaged, leading to damages worth $2,790.53. *Id.* ¶¶ 23-25, ¶ 50. Plaintiff alleges that Defendant's breach caused further damages due to Plaintiff's need to enlist the services of two replacement vendors, one to design a new website and one to manage inventory, rendering "useless" the $75,000 project launch fee. *Id.* ¶¶ 31, 58. *See also* Declaration of Carolee CEO Joel D. Fivis ("Fivis Decl."), ¶¶ 14-24, 58, D.E. No. 21-1 (claiming that Plaintiff entered new contracts at "considerable cost"). Plaintiff describes these costs as "direct and proximate," Compl. ¶ 59, as well as "compensatory, incidental and consequential," *id.* ¶ D.

In addition to the E-Commerce Agreement, Defendant ordered some merchandise from Plaintiff to sell on its own behalf. Compl. ¶ 33. Plaintiff alleges that Defendant failed to pay for merchandise worth $5,393.50. *Id.* ¶¶ 38, 56.

On June 18, 2012, Defendant filed a timely Answer. D.E. No. 6. On November 26, 2012, Magistrate Judge Arleo granted the motion of Defendant's counsel to withdraw because Defendant had terminated him as counsel and failed to pay outstanding legal fees. Letter Order, D.E. No. 14; Cert. in Support of Mot. to Withdraw, D.E. No. 13-1. The Letter Order also advised Defendant that because it is a corporate entity, it must be represented by a member of the bar and, "If counsel has not entered an appearance on behalf of it, I will ask the District Judge to strike its answer and enter default against it." D.E. No. 14. On January 31, 2013, Magistrate

**NOT FOR PUBLICATION**

Judge Mannion scheduled a pre-trial conference and warned the parties that failing to appear or to appear unprepared risked sanctions. D.E. No. 15. By way of Text Order dated February 1, 2013, Magistrate Judge Mannion also scheduled a status conference for February 26, 2013, reiterating the need for Defendant to engage counsel or risk sanctions. D.E. No. 16. This Text Order was sent via certified mail to the Defendant and a Certified Mail Receipt was returned to the Court signed by Brian C. Mather on February 6, 2013. D.E. No. 17. Defendant failed to appear. On April 4, 2013, Plaintiff's counsel asked the Court to strike Defendant's Answer for failure to defend the instant action and to impose sanctions for Defendant's failure to appear for the February 26 conference. D.E. No. 18.

On May 20, 2013, Magistrate Judge Mannion issued a report and recommendation, recommending that this Court strike Defendant's answer and enter judgment against it for failure to retain counsel and grant Plaintiff's costs and attorneys' fees related to the February 26 conference, the motion by letter to strike the answer and the motion for default judgment. D.E. No. 19 at 5. This Court adopted that report and recommendation on July 2, 2013. D.E. No. 20.

## DISCUSSION

### I. DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55 governs the entry of default and default judgment. The power to grant default judgment "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) (citations omitted). Because the entry of default prevents claims from being decided on the merits, courts do "not favor entry of defaults or default judgments." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984).

4

**NOT FOR PUBLICATION**

The first step a court must take is to evaluate the sufficiency of the pleadings. In doing so, it may treat factual allegations (other than those as to damages) as unchallenged and thus conceded by the defendant, *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir. 2005), but must independently analyze questions of law and consider whether the unchallenged facts constitute a legitimate cause of action. *Days Inn Worldwide, Inc. v. Mayu & Roshan, L.L.C.*, No. 06-1581 (PGS), 2007 WL 1674485, at *4 (D.N.J. June 8, 2007). The decision to grant or deny the motion for default judgment is then within the discretion of the district court in light of three factors: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000). Conduct is culpable if "taken willfully or in bad faith." *Id.*

The causes of action here sound in breach of contract. The elements of such a claim are "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Here, the parties had a contract, Defendant breached that contract, damages flowed therefrom and Plaintiff held up its end of the bargain. Plaintiff has pled the elements of this claim and put forth unchallenged facts which constitute a legitimate cause of action.

Under the *Chamberlain* factors, default judgment is appropriate. Plaintiff will suffer prejudice if default is denied because it has already waited more than two years to be paid under the contract. The Defendant has not presented any facts or arguments to suggest it has a litigable defense for its breaches of contract with Plaintiff. It is not clear if Defendant's failure to litigate is the result of willful or bad faith conduct, though it has failed to retain counsel – in the face of

repeated warnings – for over a year. Having considered these three factors, the Court finds that default judgment is appropriate.

II. DAMAGES

Plaintiff's motion for default judgment as to the monthly payments, damaged inventory and direct sales is granted, with pre- and post-judgment interest. Plaintiff's request for reimbursement of the project launch fee is modified but granted.

A. Standard of Review

On a motion for default judgment, a court does not accept as conceded allegations pertaining to the amount of damages. While the court may conduct a hearing to determine the damages amount, Fed. R. Civ. P. 55(b)(2), a damages determination may be made without a hearing "as long as [the court] ensure[s] that there [is] a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).

Under the Restatement (Second) of Contracts, "the injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." Restatement (Second) of Contracts § 347 (1981). One instance in which the injured party will be placed in "as good a position as he would have been in had the contract been performed" is "where the injured party has simply had to pay an additional amount to arrange a substitute transaction and can be adequately compensated by damages based on that amount." *Id.* cmt. a.

**NOT FOR PUBLICATION**

      **B.**        **Monthly payments, damaged inventory and direct sales**

The Court finds compelling Plaintiff's calculation of the amounts owed by Defendant under the contract: $130,980.72 for the missing monthly payments; $2,790.53 for damaged or missing inventory; and $5,393.50 for direct invoice sales. Fivis Decl. ¶¶ 14-15, 18, 30, 32. The Court, having considered the equities of the case, finds that pre- and post-judgment interest are appropriate on these damages.

"A federal court sitting in diversity should apply state law with respect to prejudgment interest." *Corestar Int'l Pte. Ltd. v. LPB Commc'ns, Inc.*, No. 05-cv-5850 (NLH), 2007 WL 2990896 at *4 (D.N.J. Oct. 10, 2007). In New Jersey, awarding pre-judgment interest is "a matter of discretion for the trial court" and, on a contract claim, is "governed by equitable principles," where "[t]he basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question." *Cnty. of Essex v. First Union Nat. Bank*, 186 N.J. 46, 61 (2006) (citations and quotations omitted); *see also* Restatement (Second) of Contracts § 354 (1981) ("If the breach consists of a failure to pay a definite sum in money . . . interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.").

Having considered the equities of the case, the Court finds that pre-judgment interest is appropriate. The unchallenged facts demonstrate a clear breach of contract and a straightforward failure to pay amounts due under that contract. The funds from the online sales of Plaintiff's merchandise came through Defendant, and Defendant simply failed to pass them along. Because Plaintiff has been denied use of its money, the equities weigh in Plaintiff's favor and awarding pre-judgment interest is appropriate. The remaining issue is at what rate the Court will award that interest.

**NOT FOR PUBLICATION**

Like the decision whether to award interest at all, deciding the rate of interest depends on the equities of the case. In New Jersey, the appropriate rate for post-judgment interest or interest on awards in tort cases is provided by statute: it is the average return for New Jersey's Cash Management Fund for the fiscal year ending the previous June 30. N.J.R. 4:42-11(a)(ii). The Third Circuit has warned district courts not to blindly adopt the statutory formula for *post-*judgment interest when calculating *pre-*judgment interest. *Gleason v. Norwest Mortgage, Inc.*, 253 F. App'x 198, 204 (3d Cir. 2007). Nonetheless, the statutory rate will typically be an "appropriate benchmark" for pre-judgment interest. *Id.*; *see also Benevenga v. Digregorio*, 325 N.J. Super. 27, 35 (App. Div. 1999) (finding that the statutory rate is "the standard to which trial judges should adhere" when calculating pre-judgment interest, absent "unusual circumstances"), *Lincoln Harbor Enters., LLC v. M.Y. Diplomat*, No. 08-cv-526 (WHW), 2008 WL 5046787 at *7 (D.N.J. Nov. 21, 2008). Factors to consider in analyzing the equities may include "the amount of judgment at issue," "the length of the litigation," and "the reasonable rate of return that [the non-breaching party] might have earned." *W.R. Huff Asset Mgmt. Co., L.L.C. v. William Soroka 1989 Trust*, No. 04-cv-3093 (KSH), 2009 WL 2436692 at *7 (D.N.J. Aug. 6, 2009). Whatever rate the court decides is appropriate is subject to an increase of two percentage points where the judgment exceeds $15,000. *Devine v. Advanced Computer Concepts Inc.*, No. 08-cv-875 (GEB), 2009 WL 78158 at *3 (D.N.J. Jan. 9, 2009) (citing N.J.R. 4:42-11(a)(iii)).

According to the September 19, 2013 Report of Final FY 2013 Fund Performance by the Director of the New Jersey Division of Investment, the State's Cash Management Fund (ex Police and Fire Mortgages) enjoyed a rate of return of 11.79% in the last fiscal year. Director's Report at 2, http://www.nj.gov/treasury/doinvest/pdf/index/September-013-SIC-Update-Presentation.pdf. Subject to the additional 2% to which Plaintiffs are entitled under New Jersey

**NOT FOR PUBLICATION**

Rule 4:42-11(a)(iii), the post-judgment interest rate is 13.79%. The Court finds that this rate is appropriate for calculating pre-judgment interest as well. Though it is high, the amount of judgment at issue is relatively small; the length of the litigation relatively short; and it is a reasonable rate which Plaintiff might have earned had it had access to the funds when owed.

The interest shall be awarded as simple interest. Absent unusual circumstances, the judgment bears simple interest; "compound interest is clearly the exception rather than the rule." *Johnson v. Johnson*, 390 N.J. Super. 269, 276 (App. Div. 2007). Interest is awarded as simple interest only.

The date from which the interest runs depends on when the amounts came due. The parties' contract required Defendant to submit payment "by the 15th day of the end of each month." E-Commerce Agreement ¶ 17. That wording is confusing, but appears to mean that, for example, the payment for online sales completed during June 2011 were due July 15, 2011. Pre-judgment interest will be calculated from those due dates. The $29,663.89 due for June 2011 sales, with simple interest of 13.79% running since July 15, 2011, becomes $38,802.93; the $13,647.39 due for July 2011 sales becomes $17,692.24; the $16,200.59 due for August 2011 sales becomes $20,812.54; the $21,175.03 due for September 2011 sales becomes $26,963.27; the $18,474.91 due for October 2011 sales becomes $23,308.82; the $30,417.62 due for December 2011 sales becomes $37,675.77; and the $1,401.28 due for January 2012 sales becomes $1,719.25. Pre-judgment interest shall accrue on the unreturned or damaged merchandise ($2,790.53) and the merchandise purchased for direct sale ($5,393.50) beginning on the effective date of termination, December 18, 2011, so the total due on those amounts is $3,485.90 and $6,737.50, respectively. The total amount which Defendant owes to Plaintiff for these causes of action, including pre-judgment interest, is $177,198.22.

**NOT FOR PUBLICATION**

Post-judgment interest applies as of the date of this opinion and accompanying order.

### C. The Launch Fee

In addition to the payments Defendant failed to deliver and inventory it failed to return, Plaintiff claims that Defendant's breach rendered "useless" the $75,000 project launch fee and caused Plaintiff to incur "considerable cost" finding replacement vendors. This request requires the Court to determine whether the damages sought are "direct" or "consequential" and to consider the fact that Defendant successfully completed the launch of the Client Site.

Two provisions of the E-Commerce Agreement apply here. In the event of termination, the breaching party becomes liable for "all out-of-pocket costs" which cannot be mitigated or avoided. E-Commerce Agreement § 11.3. The limitation of damages provision prohibits the non-breaching party from recovering "indirect," "incidental" or "consequential" damages unless the breach was negligent or intentional. *Id.* § 10.2. The complaint does not explicitly allege that Defendant's breach was negligent or intentional. It argues instead that Defendant's breach rendered the $75,000 launch fee "useless" and led Plaintiff to incur "considerable cost." Compl. ¶ 31. In one place it characterizes these damages as "direct and proximate," *id.* ¶ 59, but in another characterizes them as "compensatory, incidental and consequential," *id.* ¶ D. This raises the important question of whether the damages Plaintiff incurred by procuring substitute vendors were direct or consequential.

The general rule of expectation damages is to put an injured party in as good a position as it would have been had the breaching party fully performed. Restatement (Second) of Contracts § 344(a). "Direct" damages are equal to the loss in value to the non-breaching party of the breaching party's failure to perform. *Id.* § 347(a). The cost "to arrange a substitute transaction" is a standard measure of expectation damages. *Id.* cmt. a. Consequential damages, on the other hand, are indirect but foreseeable damages which the non-breaching party suffers as a result of

10

**NOT FOR PUBLICATION**

the breach: "[T]he difference between direct and consequential damages depends on whether the damages represent (1) a loss in value of the other party's performance, in which case the damages are direct, or (2) collateral losses following the breach, in which case the damages are consequential." *Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 179 (3d Cir. 2011). *See also Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) ("Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract."). In *Atlantic City Associates*, the Third Circuit considered four costs that a developer incurred as a result of a contractor's errors: additional construction costs to fix the errors, lost rental income, additional payments to contractors due to delay, and additional administrative costs. 453 F. App'x at 178. The court found that only the costs needed to fix the errors could be awarded as direct damages, and the rest were consequential damages prohibited by the limitation of damages provision in the parties' contract. *Id.* at 180.

Here, the damages Plaintiff suffered due to Defendant's breach—namely, its need to hire new vendors to take over Defendant's tasks—share some qualities of both direct and consequential damages. The way Plaintiff has described them makes them seem consequential, including the fact that the Complaint explicitly describes them as such. Compl. ¶ D. But they are better considered direct damages because they reflect a loss in value to Plaintiff caused by Defendant's breach.[1] Determining the magnitude of that loss in value hinges on the tricky question of how often a company should redesign its website.

---

[1] Plaintiff also claims that contracting with these new vendors entailed "considerable cost." Fivis Decl. ¶ 23. To the extent this refers to search and transaction costs, these are incidental damages barred by the E-Commerce Agreement's Limitation on Damages provision. *See* Restatement

11

**NOT FOR PUBLICATION**

Plaintiff contracted to pay Defendant the $75,000 project launch fee for "design, integration, programming and deployment of the Client site." Statement of Work § 3(a). Defendant completed those tasks. But the benefit of the bargain which Plaintiff expected from this Agreement was that the site would last: The initial term of the contract was five years (60 months), suggesting that Plaintiff expected it would be at least that long before carolee.com required a redesign. E-Commerce Agreement § 11.1. The website Defendant designed, like any website, is a capital investment which depreciates over time—and quite rapidly so, given the pace of technological change and shifts in style. The parties have not briefed the issue of website depreciation and the Court declines to engage in any complex calculations. For the Court's purposes, it suffices to assume that the launch went ahead as planned in August 2010, see Statement of Work § 2; that Defendant's version of the site remained functional until January 2012; and that it thus lasted about 18 months, or 30% of the 60-month term that Plaintiff expected. Plaintiff thus received about 30% of the benefit of the bargain.

The Court thus finds that Plaintiff's loss in value as a result of Defendant's breach was 70% of the $75,000 project launch fee, or $52,500. Subject to pre-judgment interest at 13.79% from the date of termination, December 18, 2011, Defendant owes $65,582.37. Post-judgment interest shall accrue from the date of this opinion and accompanying order.

## ATTORNEYS' FEES

"Although attorneys' fees are not generally awarded to the winning party, if the parties provide for the award of such fees the court will award a sum that it considers to be reasonable."

---

(Second) of Contracts § 347 cmt. c; E-Commerce Agreement § 10.2. Plaintiff has failed to allege that Defendant's default was intentional or negligent, as would be necessary to overcome that provision. E-Commerce Agreement § 10.2.

12

**NOT FOR PUBLICATION**

Restatement (Second) of Contracts § 356, cmt. (d) (1981). Here, the parties have provided for the award of such fees. E-Commerce Agreement § 12.8.

The described legal expenses, including fees of $15,123.75 and costs of $529.29 for a total of $15,653.04, are eminently reasonable. Decl. of Neil B. Friedman ("Friedman Decl."), D.E. No. 21-2. The attorneys' hourly rates of $325 or $310 per hour are also reasonable. *Id.* ¶ 24. Magistrate Judge Mannion recommended an award of costs and attorneys' fees relating only to the February 26, 2013 in-person status conference, the motion by letter to strike the answer and the motion for default judgment, amounts totaling $3,887.81. D.E. No. 19 at 5; Friedman Decl. ¶ 18. This Court adopted that report and recommendation, D.E. No. 20, and today finds that Plaintiff is also entitled to attorneys' fees and expenses for the filing of the Complaint, which they estimate to be $11,765.23. Friedman Decl. ¶ 18.

These fees are subject to post-judgment interest at the rate of 13.79%, as explained above.

## CONCLUSION

The Court grants the motion for default judgment. Judgment is entered against eFashion Solutions, LLC in the amount of $258,433.64 plus post-judgment interest.


Date: October 9, 2013

**s/ William H. Walls**
United States Senior District Judge
